1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

MICHELLE F. G.,[1]

     Plaintiff,

  v.

ANDREW SAUL, Commissioner of
Social Security,

     Defendant.

Case No. EDCV 19-02156-RAO

**MEMORANDUM OPINION AND
ORDER**

I. **INTRODUCTION**

  Plaintiff Michelle F. G. ("Plaintiff") challenges the Commissioner's denial of
her application for a period of disability, disability insurance benefits ("DIB"), and
supplemental security income ("SSI"). For the reasons stated below, the decision of
the Commissioner is AFFIRMED.

///

///

///

---

[1] Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B)
and the recommendation of the Committee on Court Administration and Case
Management of the Judicial Conference of the United States.

## II.   **PROCEEDINGS BELOW**

On or about December 14, 2015, Plaintiff filed a Title II application for a period of disability and DIB alleging disability beginning on February 12, 2012.[2] (Administrative Record ("AR") 239-40; *see* AR 270.)  Plaintiff also filed a Title XVI application for SSI.  (AR 246-49.)  Her application was denied initially on June 15, 2016 (AR 145-49), and upon reconsideration on August 17, 2016 (AR 154-59).  Plaintiff filed a request for a hearing (AR 162-63), and a hearing was held on August 16, 2018 (AR 39-72).  Represented by counsel, Plaintiff appeared and testified, along with an impartial vocational expert.  (AR 39-72.)  On September 26, 2018, the Administrative Law Judge ("ALJ") found that Plaintiff had not been under a disability, pursuant to the Social Security Act, from February 12, 2012 through the date of the decision.  (AR 27.)  The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review.  (AR 1-4.)  Plaintiff filed this action on November 8, 2019.  (Dkt. No. 1.)

The ALJ followed a five-step sequential evaluation process to assess whether Plaintiff was disabled under the Social Security Act.  *See Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995).  At **step one**, the ALJ found that Plaintiff did not engage in substantial gainful activity since February 12, 2012.  (AR 13.)  At **step two**, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease; plantar fascial fibromatosis; carpal tunnel syndrome; depression, anxiety; and obesity.  (*Id.*)  At **step three**, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  (AR 14.)

///

---

[2] In her applications, Plaintiff alleged her disability began on April 16, 2015.  (*See* AR 239.)  However, Plaintiff's alleged onset date is identified as February 12, 2012 in the Disability Report.  (AR 270.)

Before proceeding to step four, the ALJ found Plaintiff had the residual functional capacity ("RFC") to:

> [P]erform light work . . . except she can stand and/or walk for a combined four hours out of the eight-hour workday with customary breaks.  She can occasionally climb, balance, stoop, kneel, crouch, and crawl.  She can have no more than frequent exposure to hazards such as unprotected heights and dangerous machinery.  She can frequently work on uneven terrain.  She can perform tasks of a nature that can be learned within a short demonstration period of approximately 30 days.  She can work primarily with things, rather than with people, such that the work contact with others is only on an occasional basis.  She must be permitted to use a cane for prolonged walking.

(AR 16.)

At **step four**, the ALJ found that Plaintiff was unable to perform any past relevant work.  (AR 24.)  At **step five**, the ALJ found there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  (AR 25.)  Accordingly, the ALJ determined that, as to Plaintiff's claim for a period of disability, DIB, and SSI, Plaintiff had not been under a disability from February 12, 2012, through the date of the decision.  (AR 27.)

## III.   STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  A court must affirm an ALJ's findings of fact if they are supported by substantial evidence and if the proper legal standards were applied.  *Mayes v. Massanari*, 276 F.3d 453, 458-59 (9th Cir. 2001).  "Substantial evidence . . . is 'more than a mere scintilla[,]' . . . [which] means--and means only--'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Biestek v. Berryhill*, —U.S. —, 139 S. Ct. 1148, 1154, 203 L. Ed. 2d 504 (2019) (citations omitted); *Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017).  An ALJ can satisfy the substantial evidence requirement "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his

interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citation omitted).

"[T]he Commissioner's decision cannot be affirmed simply by isolating a specific quantum of supporting evidence.  Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001) (citations and internal quotation marks omitted).  "'Where evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005)); *see Robbins v. Social Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) ("If the evidence can support either affirming or reversing the ALJ's conclusion, we may not substitute our judgment for that of the ALJ.").  The Court may review only "the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)).

## IV.   **DISCUSSION**

Plaintiff raises a single issue for review – whether the ALJ properly rejected Plaintiff's statements concerning pain, symptoms, and level of limitation.  (*See* Joint Submission ("JS") 5-17.)   The Commissioner contends that "the ALJ provided several reasons for finding Plaintiff's subjective complaints inconsistent with the record." (JS 30; *see* JS 17-34.)

### A.   **Plaintiff's August 16, 2018 Testimony**

Regarding previous work, Plaintiff explained that she last worked as a bus driver.  (AR 44.)   She filed a worker's compensation claim due to the "toll" that sitting and driving took on her back.  (*Id.*)  She stopped working around 2010.  (AR 45.)  In 2015, she worked for In-Home Support Services for a few months.  (AR 45-46.)  She explained that she would help make meals.  (AR 45.)  Plaintiff stopped

working because her "disability just started happening more, like more chronic." (AR 46.) She tried to get another job as a bus driver, but could not pass the test. (*Id.*) She did not look for any other kind of work. (AR 46-47.) Plaintiff also worked as a cashier. (AR 63.) She did not have to lift more than five pounds, and spent most of the day standing and walking. (AR 63-64.)

Plaintiff rents a room from a friend. (AR 47.) She has a driver's license. (*Id.*) Plaintiff and her sister drove 20 to 25 minutes to the hearing. (AR 47-48.) Her sister drove part of the way, and Plaintiff drove the other part. (AR 47.) Plaintiff explained that her hands get numb and hurt because of her carpal tunnel. (*Id.*)

Plaintiff explained that it takes her "a while" to get up because she has difficulty sleeping through the night. (AR 48.) When she wakes, she sits up for a minute before getting up because her feet tend to hurt a lot. (*Id.*) Once she begins walking, she needs to hold onto something, like the wall, to prevent her from falling. (AR 48-49.) She is able to shower on her own, but sometimes has difficulty dressing. (AR 49.) Her son and his girlfriend help her put on clothes, and they help with laundry. (*Id.*) Plaintiff reported that she stays in the house, unless she has appointments. (*Id.*) When she has appointments, her medical service provider sends a van for transportation. (*Id.*) Plaintiff spends her days at home with her son and his girlfriend. (AR 49-50.) Plaintiff does not help with any of the chores, and everyone cooks for themselves. (AR 50.) She prepares simple meals for herself, including "microwave foods" and sandwiches. (*Id.*) Plaintiff goes to the store, and her son helps her place the groceries in the basket. (AR 50-51.) She pushes the basket in lieu of using her cane to walk. (AR 51.)

Plaintiff reported that she keeps busy by watching television, doing crosswords, surfing the internet, and reading. (AR 51-52.) Plaintiff alternates between laying down and sitting on a couch. (AR 51.)

Plaintiff noted that her conditions have worsened since she stopped working. (AR 52-53.) She sees a chiropractor who said that Plaintiff's back has worsened.

(AR 53.)  Pain in her left knee prevents her from doing many things.  (*Id.*)  Plaintiff reported suffering from gout, for which she takes medication.  (*Id.*)  She also noted that post-surgery, she had foot pain.  (*Id.*)  Plaintiff has asthma, and carpal tunnel syndrome.  (AR 54.)

Plaintiff has used a cane for approximately six years.  (AR 54.)  She was given the cane when she underwent physical therapy as part of her worker's compensation claim.  (*Id.*)  She uses the cane to walk longer distances when she goes out of the house, including when she goes to stores, and when she does to medical appointments.  (AR 54-55.)  Plaintiff is on approximately 11 medications, and reports sleepiness as a side effect.  (*Id.*)  She explained that she cannot sleep through the night, wakes up too early, and then wants to go back to sleep.  (AR 56.)  Her pain pills are not helping, and she is waiting to go back to pain management.  (AR 57.)  Plaintiff also underwent surgery, but she does not believe it was helpful because the pain is still present.  (AR 57-58.)

Plaintiff suffers from depression.  (AR 54, 56.)  She sees a psychologist two times per month and takes medication.  (*Id.*)  Plaintiff noted that she is managing her depression, but that every day is a new day.  (*Id.*)  She explained that anniversaries and her father's birthday are "harder" for her.  (*Id.*)

As to her abilities, Plaintiff is able to stand for approximately five or ten minutes, but she tends to take off her shoes and stands on one foot at a time.  (AR 58.)  She can walk between ten and 15 minutes and sit for five to ten minutes.  (*Id.*)  She alternates between sitting and standing.  (*Id.*)  Plaintiff lays down between ten and 13 hours during the day.  (AR 59-60.)  She can lift ten pounds.  (AR 60.)  She experiences pain when she climbs stairs.  (*Id.*)  She is not able to bend down all the way.  (*Id.*)  She cannot kneel or crouch.  (AR 61.)

**B.    Plaintiff's January 5, 2016 Function Report**

Plaintiff prepared a function report.  (*See* AR 284-92.)  Plaintiff reported that she is limited in her ability to work due to consistent sharp and aching lower back

pain. (AR 284.)  The pain radiates down to her feet, but the pain is greater on the left side. (*Id.*)  She also experiences stiffness in her lower back. (*Id.*)

Plaintiff reported that after she wakes up, she folds her blankets, eats, takes a shower, sits in a chair, watches television, eats again, takes a shower, and then goes to bed. (AR 285.)  She does not take care of anyone else and does not take care of any pets. (*Id.*)  Because of her condition, Plaintiff cannot sleep, she tosses and turns as she tries to get comfortable. (*Id.*)

As to her personal care, Plaintiff explained that she has difficulty reaching her feet. (AR 285.)  Similarly, she experiences difficulty taking showers when bending and drying. (*Id.*)  She also noted that it hurts to stand for a long time in the shower, and her lower back, legs, and feet hurt. (*Id.*)  Plaintiff also explained that her legs and lower back hurt when she bends, stretches, or sits down. (*Id.*)  She is "okay" to feed herself. (*Id.*)  She has difficulty using the toilet. (*Id.*)  She does not need special reminders to take care of personal needs and grooming. (AR 286.)  She uses a daily medication container and calendar to remind her to take her medicine. (*Id.*)

Plaintiff reported that she prepares her daily meals. (AR 286.)  She prepares sandwiches, soups, canned food, and frozen dinners. (*Id.*)  Plaintiff explained that since her conditions began, she is unable to stand long enough to cook a full meal. (*Id.*)  As to housework, Plaintiff is able to fold blankets and wash clothes. (*Id.*)  It takes her between two and three hours to wash clothing and only 15 minutes to fold her blankets. (*Id.*)  Plaintiff needs help or encouragement to do these things. (*Id.*)  She goes outside every day to check the mail. (AR 287.)  When she goes out, she drives, rides in a car, or rides a bicycle. (*Id.*)  She can go out alone and can drive. (*Id.*)  She goes shopping in stores weekly to buy food, fruit, and vegetables. (*Id.*)  Plaintiff reported that she is able to pay bills, count change, handle a savings account, and can use a checkbook and money orders. (*Id.*)

As to hobbies and interests, Plaintiff noted that she watches television daily. (AR 288.)  However, she explained that since onset of her conditions, she falls asleep

during movies and while watching television. (*Id.*) Plaintiff meets with her counselor once or twice per month. (*Id.*) She does not have any problems getting along with family. (AR 289.) She reported that since her conditions began, she is distant, is in her own world, is stressed, depressed, and in pain. (*Id.*)

Plaintiff noted that her conditions affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, hear, climb stairs, and remember. (AR 289.) She also noted the conditions affect her ability to remember, complete tasks, concentrate, and follow instructions. (*Id.*) She is able to lift ten pounds. (*Id.*) She needs to use a cane or push a basket. (*Id.*) She can sit with a pillow in her back. (*Id.*) Plaintiff can pay attention for a short period of time and does not finish what she starts. (*Id.*) She can follow written instructions "okay," but does not follow spoken instructions well because she loses concentration. (*Id.*) She explained that depression gets in the way. (*Id.*)

Plaintiff reported that she gets along well with authority figures. (AR 290.) She does not handle stress well, because she gets emotional and starts crying. (*Id.*) She feels stressed, confused, and overwhelmed by changes in her routine. (*Id.*) Plaintiff explained that she is depressed because her husband murdered her father. (*Id.*) She was prescribed a cane in 2011. (*Id.*) She uses the cane in stores or as extra support to prevent her from falling or limping. (*Id.*) Plaintiff takes gabapentin, tramadol, and baclofen, which cause drowsiness. (AR 291.) Plaintiff also experiences dizziness from baclofen and sertraline. (*Id.*)

### C. Applicable Legal Standards

In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (citing *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Treichler v.*

1   *Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting

2   *Lingenfelter*, 504 F.3d at 1036) (internal quotation marks omitted).  If so, and if the

3   ALJ does not find evidence of malingering, the ALJ must provide specific, clear and

4   convincing reasons for rejecting a claimant's testimony regarding the severity of his

5   symptoms.  *Id.*  The ALJ must identify what testimony was found not credible and

6   explain what evidence undermines that testimony.  *Holohan v. Massanari*, 246 F.3d

7   1195, 1208 (9th Cir. 2001).  "General findings are insufficient."  *Lester*, 81 F.3d at

8   834.

9   **D.    Discussion**

10   "After careful consideration of the evidence," the ALJ found that Plaintiff's

11   "medically determinable impairments could reasonably be expected to cause the

12   alleged symptoms," but found that Plaintiff's "statements concerning the intensity,

13   persistence and limiting effects of these symptoms are not entirely consistent with

14   the medical evidence and other evidence in the record."  (AR 17.)   In finding

15   Plaintiff's statements were not entirely consistent with the record, the ALJ relied on:

16   (1) lack of supporting objective medical evidence; (2) Plaintiff's course of treatment;

17   and (3) inconsistencies with Plaintiff's statements and day-to-day activities.[3]  (*See*

18   AR 17-22.)   No malingering allegation was made, and therefore, the ALJ's reasons

19   must be clear and convincing.

20   *1.     Reason No. 1: Lack of Supporting Objective Medical Evidence*

21   The ALJ found that "the evidence of record does not support the extent of

22   [Plaintiff's] allegations." (AR 21.)   The lack of supporting objective medical

23   evidence cannot form the sole basis for discounting testimony, but is a factor the ALJ

24   may consider in making a credibility determination.  *Burch*, 400 F.3d at 681; *Rollins

25   v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. § 404.1529(c)(2)).

---

26   [3] Plaintiff preemptively argues that "[t]o the extent the ALJ rejected [Plaintiff's]

27   statements based on the opinions [of state agency consultants], the ALJ erred."  (JS

28   15.)  However, the Court's review of the record finds that the ALJ did not reject or
discount Plaintiff's statements based on the opinions of the state agency consultants.

As to Plaintiff's allegations regarding her lower back pain, the ALJ noted that Plaintiff had a 2012 worker's compensation claim due to the gradual onset of lower back pain.  (AR 17.)  The ALJ identified November 2011 lumbosacral x-rays with normal results (*see* AR 381-82) and a 2012 MRI (*see* AR 377-78) documenting "disc bulging and congenitally foreshortened pedicles impinging the L5 roots in the lateral recesses without appreciable neuroforaminal stenosis in the lumbar spine."  (AR 17.)  The ALJ noted that despite the findings in the 2012 MRI, an electrodiagnostic report of Plaintiff's lower extremities was normal.  (AR 18, citing AR 383.)  Plaintiff sought treatment again in August 2015 and reported a "five-year history of low back pain and demonstrated tenderness to palpitation of the low spine."  (AR 18.)  The same day Plaintiff exhibited a full range of motion and strength, and negative straight leg raises bilaterally.  (*Id.*; *see* AR 446.)  In discussing treatment, Plaintiff was cautioned that narcotics would not be prescribed for her lower back pain absent a "remarkable MRI" and she was referred to imaging services.  (AR 447; *see* AR 18.)  The ALJ further noted that Plaintiff was prescribed gabapentin and naproxen by a physician's assistant, and was encouraged to stretch and exercise.  (AR 18, citing AR 422, 614.)

The ALJ pointed to a 2016 independent consultative examination.  (AR 18; *see* AR 493.)  Specifically, the ALJ noted that while Plaintiff endorsed chronic back pain, she did not appear to be in acute distress.  (AR 18, citing AR 493-94.)  Similarly, Plaintiff reported using a cane, but was able to stand briefly on her toes and heels, and could stand on one leg without using a cane.  (AR 18, citing AR 495.)  While Plaintiff reported experiencing pain when raising her right leg from a seated position, her left leg raising was normal.  (*Id.*)  The ALJ also noted that Plaintiff had "reduced flexion, but normal extension and normal lateral movement of the lumbar spine." (*Id.*)  During the examination Plaintiff had full strength in all major muscle groups, no sensory abnormality, and normal reflexes, but did have mildly reduced right quadricep strength.  (*Id.*)

///

The ALJ noted that Plaintiff had a "slip and fall" incident, but x-rays were normal, and she had normal motor function in her lower extremities with normal reflexes. (AR 18, citing AR 503-04, 560-75, 657.)  Plaintiff was referred to physical therapy and a chiropractor for her chronic back pain and continued taking Cymbalta and gabapentin. (AR 18; *see* AR 652, 659.)

The ALJ also pointed to a November 2016 MRI which did not reflect an acute abnormality.  (AR 18, citing AR 728.)  The ALJ noted that the MRI documented "degenerative changes including disc bulging with minimal to mild neuroforaminal narrowing at L4-L5, moderate narrowing of the central canal with no significant neuroforaminal narrowing at L4-L5, and the left facet joint abutting the left SI nerve root without significant canal narrowing at L5-Sl." (AR 18, citing AR 687-88, 727.) Plaintiff's alignment and signal were normal, and her visualized retroperitoneal structures were unremarkable.  (*Id.*)  Notably, the ALJ pointed to records where Plaintiff "was encouraged to maintain daily activity, stretch, use ice and heat, and a medium-firm mattress."  (AR 18, citing AR 883.)[4]

Records from 2017 documented Plaintiff's steady gait and note that she had not undergone physical therapy.  (AR 18, citing AR 1032, 1075.)  The ALJ also pointed to records documenting that Plaintiff stopped attending pain management from May to September 2017 because her "narcotics were discontinued due to irregularities on drug urine screens including the absence of prescribed medication and positive result for heroin, though she denied these findings."  (AR 18-19, citing AR 717, 723, 736.)  In October 2017, Plaintiff was found to have a normal range of

---

[4] The ALJ points to three other records.  (AR 18; *see* AR 703, 719, 721.)  However, those documents do not support the ALJ's statement.  The ALJ cited to a page with three websites listed.  (AR 703.)  The ALJ also pointed to a generic letter issued to "LAGS Medical Center Patient[s]" informing them of the Drug Enforcement Agency's mandate ordering that the amount of opioid medication manufactured be reduced by 25 percent or more.  (AR 719.)  Lastly, the ALJ cited to a letter from Plaintiff to the Medical Board of California in which Plaintiff discusses her treatment and a physician's refusal to provide medication.  (AR 721; *see* AR 722.)

motion of her extremities, intact neurovascular function, and was referred to a chiropractor. (AR 19, citing AR 812; *see* AR 811.) The ALJ also pointed to Plaintiff's emergency room visit in December 2017, where Plaintiff reported 8/10 back pain, but she did not appear to be in acute distress. (AR 19, citing AR 915.) Plaintiff reported tenderness, but "there was no palpable step off or mass," she had a steady gait, full motor strength, and intact sensation. (*Id.*) She reported that she was no longer in pain management because she was no longer receiving treatment through worker's compensation and because of the "way she was being treated." (*Id.*) Plaintiff was given pain medication, and walked out of the emergency department without assistance when she was discharged. (AR 19, citing AR 916.) At a follow up appointment, Plaintiff was given Tylenol with codeine and referred to a chiropractor, but the ALJ noted that the record indicates Plaintiff did not agree to a pain management plan. (AR 19, citing AR 788.)

The ALJ found Plaintiff's 2018 records were similar and pointed to records documenting Plaintiff's normal strength, muscle tone, and reflexes, and lack of acute distress. (AR 19, citing AR 731, 738, 745, 764, 903, 1102, 1106.) However, the ALJ did point to an April 2018 MRI documenting "degenerative changes between L3-L5." (AR 19; *see* AR 897.) The ALJ also noted that in March 2018, Plaintiff became upset with a new physician when she was denied "narcotics before undergoing a drug screen." (AR 19, citing AR 743.) Plaintiff "declined to provide a urine sample and threatened to report the physician." (*Id.*) Additionally, the ALJ relied on emergency department records from April 2018 where Plaintiff was "ambulatory with a steady gait, and her back was nontender to palpation." (AR 19, citing AR 903.) She reported that she was out of pain medication, was given Toradol, and released. (*Id.*) At a follow-up appointment, Plaintiff alleged "radiating pain," but "denied weakness or numbness, and demonstrated normal strength, muscle tone, reflexes, sensation, coordination, gait and station on examination." (AR 19, citing AR 738.) As to treatment, Plaintiff was advised that the main treatment, other than physical therapy,

was weight loss, and the doctor noted that she would not recommend narcotics "due to high risk history and mental illness comorbidity." (AR 738; *see* AR 19.) In June 2018, Plaintiff went to a walk-in clinic alleging increased low back pain, "but did not appear to be in acute distress, demonstrated normal strength, and was not considered a fall risk." (AR 19, citing AR 1102, 1106.) She was prescribed hydrocodone. (*Id.*)

Ultimately, the ALJ reasoned that while Plaintiff "has a long history of low back pain associated with reduced range of motion of the low back with intermittent radiating symptoms," Plaintiff "is not a surgical candidate, has rejected recommended treatments, repeatedly discontinued pain management due to irregularities, and instead sought narcotic medications at urgent care clinics contrary to medical advice." (AR 21, citing AR 736, 743, 824, 1102, 1106.) Additionally, the ALJ found that despite complaints of acute and chronic pain, Plaintiff "did not appear to be in distress." (AR 21, citing AR 493-94, 905, 1102, 1106, 1122.)

As to Plaintiff's foot pain, Plaintiff was treated for plantar fascial fibromatosis beginning in 2015. (AR 19, citing AR 447.) The ALJ noted that Plaintiff reported experiencing heel pain and was treated with a steroidal injection. (*Id.*) Plaintiff was diagnosed with tendinitis and plantar fasciitis in late 2015. (AR 19, citing AR 489.) The ALJ identified records where Plaintiff reported foot pain when she walked or stood for long periods and was unable to perform a heel rise on one foot. (*Id.*) However, the ALJ relied on Plaintiff's good muscle strength of all foot prime movers, her ankle with adequate muscle tone and symmetry, full and fluid range of motion of all joints from her ankle to her toes without crepitation, and normal coordination, sensation and circulation. (AR 19-20, citing AR 488-89.) The ALJ pointed to 2016 x-rays showing calcanea spurs, but noted that results were otherwise normal and did not have evidence of fracture, dislocation, or foreign body. (AR 20, citing AR 692, 707, 710, 987.) The "adjacent soft tissues [were] unremarkable." (AR 710; *see* AR 20.) Plaintiff was treated with injections until June 2017, when she underwent bilateral endoscopic plantar fasciotomies. (AR 20, citing AR 857, 883.) The ALJ

1   noted that despite Plaintiff's noncompliance with post-surgery instructions, Plaintiff

2   did not develop persistent complications.  (AR 20, citing AR 841.)

3          Accordingly, the ALJ found that Plaintiff's statements regarding her feet had

4   "resolved surgically" and that despite her reports of no improvement, Plaintiff

5   reported that the pain had improved.  (AR 21, citing AR 831.)  Moreover, the ALJ

6   relied on Plaintiff's inconsistent use of a cane, reports of a normal, independent gait,

7   and normal examination results showing Plaintiff "retained grossly intact strength,

8   sensation, reflexes and circulation in the lower extremities."  (AR 21, citing AR 488-

9   89, 495, 503-04, 560-75, 657, 731, 738, 745, 764, 812, 823, 828, 832, 903, 915, 1102,

10  1106.)

11         As to Plaintiff's carpal tunnel syndrome, the ALJ noted that Plaintiff "only

12  intermittently endorsed symptoms and demonstrate[d] normal functioning other than

13  decreased sensation on examination."  (AR 20, citing AR 731.)  While the ALJ

14  pointed to records documenting that Plaintiff wore a wrist brace (AR 883) and noted

15  that complaints of bilateral hand pain and numbness were confirmed by

16  electrodiagnostic testing showing bilateral carpal tunnel (AR 729), the ALJ relied on

17  Plaintiff's intact grip strength and deep tendon reflexes (AR 494-96).  (AR 20.)

18  Additionally, the ALJ relied on the fact that "[t]here is little reference to the condition

19  for nearly a year, when [Plaintiff] was given wrist braces."  (*Id.*, citing AR 812.)

20  Again in 2018, Plaintiff reported a "multiyear history of carpal tunnel syndrome,"

21  yet had a full range of motion without atrophy and normal reflexes bilaterally.  (AR

22  20, citing AR 690, 731, 757.)  The ALJ compared records from December 2016 and

23  April 2018, and recognized that Plaintiff exhibited a decreased sensation to light

24  touch and pinpricks.  (AR 20, citing AR 690, 731.)  The ALJ also noted that Plaintiff

25  was given "a referral for a surgical evaluation without further development."  (AR

26  20; *see* AR 731.)   Thus, the ALJ reasoned that Plaintiff's allegations were

27  inconsistent with the record showing only intermittent complaints and normal results

28  ///

indicating intact grip strength, coordination, and reflexes.  (AR 21, citing AR 494-96, 690, 731, 757.)

As to Plaintiff's mental health, the ALJ noted that Plaintiff reported depression and anxiety in August 2015.  (AR 20, citing AR 443, 446, 594.)  The ALJ reasoned that notwithstanding Plaintiff's reports, she had adequate grooming, cooperative attitude, good eye contact during year-long treatment, and reported "some improvement from an antidepressant."   (AR 20, citing AR 594-671, 675.)  Additionally, Plaintiff was talkative and insightful regarding her symptoms (AR 594), and "demonstrated linear thought processes with unremarkable content and was free of perceptual disorders or suicidality" (AR 610, 617).  (AR 20.)   Similarly, Plaintiff had "appropriate mental status for her age, was alert and cooperative, and exhibited full mood and affect, normal eye contact, and good judgment and insight." (AR 20; *see* AR 589, 1075.)

The ALJ also pointed to a March 2016 examination in which Plaintiff presented intact mental status, was punctual, fully oriented, and appropriately dressed and groomed.  (AR 20, citing AR 508; *see* AR 507-10.)  Plaintiff was diagnosed with major depressive disorder with anxious distress.  (AR 509; *see* AR 20.)  Plaintiff also had "intact speech, fund of knowledge, recall, abstraction, attention, concentration, judgment, and insight, and was able to perform calculations without difficulty."  (AR 20, citing AR 509).  Moreover, there was no evidence that Plaintiff had thought or perceptual abnormality.  (AR 20, citing AR 508.)

In 2017, Plaintiff was diagnosed with mild depression, but did not meet the criteria for posttraumatic stress disorder.  (AR 21, citing AR 815.)  However, the ALJ noted that Plaintiff had "a normal appearance, good eye contact, appropriate speech, good to fair judgment, intact thought processes and unremarkable thought content, and was free of perceptual disorders."  (AR 21, citing AR 741, 748, 754, 767, 781, 788, 808, 815.)  Additionally, Plaintiff was cooperative, had appropriate mental status and intact cognition, and had declined medication for anxiety.  (AR 21, citing

AR 731, 808, 940, 1102.)  Plaintiff also reported that "she felt better when she kept herself busy and found it to be an effective coping skill."  (AR 21, citing AR 772.) Ultimately, in finding that the evidence did not support the extent of Plaintiff's allegations, the ALJ relied on records depicting that Plaintiff "routinely demonstrated appropriate mental status, appearance, behavior, and thoughts, and intact cognition, attention, judgment and insight."  (AR 21, citing AR 507-10, 594-671, 675, 731, 808, 940, 1075, 1102.)

Plaintiff contends that "[a] review of the ALJ's references to the medical evidence raises the question of whether the ALJ properly considered the record as a whole when evaluating [Plaintiff's] symptom testimony."  (JS 8.)  In support of her position, Plaintiff cites to medical records which the ALJ allegedly omitted from his analysis.  (*See* JS 10-14.)  However, an ALJ is "not required to discuss every piece of evidence" in making a disability determination.  *Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) (quoting *Howard v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir.2003)).  Notably, the ALJ did discuss some of the treatment records that Plaintiff contends the ALJ ignored, (*see* AR 18-21; *see also* JS 12, citing AR 710, 757, 811, 883; JS 13, citing AR 657, 811, 824; JS 14, citing AR 617, 754), which suggests that the ALJ reviewed the record in its entirety and rendered a decision based upon consideration of all of the evidence.  Additionally, while Plaintiff may disagree with the ALJ's interpretation, "it is the ALJ's responsibility to resolve conflicts in the medical evidence and ambiguities in the record."  *Otanez v. Saul*, No. EDCV 19-00300-JEM, 2020 WL 70886, at *8 (C.D. Cal. Jan. 7, 2020) (citing *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).  Finally, Plaintiff has not shown that the evidence she cites is significant or probative.  *See Howard*, 341 F.3d at 1012 ("ALJ is not required to discuss evidence that is neither significant nor probative").

The Court finds that the ALJ thoroughly considered Plaintiff's medical records (*see* AR 17-21) and found that the evidence did not support the extent of Plaintiff's allegations (*see* AR 21).  *See Reddick*, 157 F.3d at 725.  Throughout the decision, the

ALJ relies on medical records documenting normal examination results, which the ALJ was allowed to rely on in assessing Plaintiff's testimony. *See Garza v. Astrue*, 380 F. App'x 672, 674 (9th Cir. 2010) (finding that an ALJ properly considered a claimant's normal exam findings when noting a lack of objective medical evidence to support the claimant's allegations); *see also Margolis v. Berryhill*, No. CV 17-5047 SS, 2018 WL 3129775, at *10 (C.D. Cal. June 22, 2018) (holding that ALJ may rely on normal and unremarkable examinations in discounting a claimant's subjective testimony).   Additionally, the ALJ was allowed to rely on reports of Plaintiff's improved conditions (*see* AR 772, 831).  *See De Herrera v. Astrue*, 372 F. App'x 771, 774  (9th Cir. 2010) (finding that an ALJ properly considered a claimant's improved condition with treatment in discounting a claimant's complaints of debilitating pain); *Huntsman v. Colvin*, No. EDCV 13-1300 JC, 2014 WL 808020, at *9 (C.D. Cal. Feb. 28, 2014) (holding that ALJ may rely on medical records reflecting improvement over time and refusing to "second guess the ALJ's reasonable interpretation of this medical evidence which is supported by substantial evidence in the record.").

While there may be other evidence in the records which supports Plaintiff's position, the ALJ was allowed to weigh the multiple normal examination results and documented improvement in finding Plaintiff's testimony was not supported by the medical evidence.  Where, as here, the evidence might be susceptible to more than one rational interpretation, the ALJ's decision should be upheld.  *See Ryan*, 528 F.3d at 1198 (citing *Burch*, 400 F.3d at 679); *see Robbins*, 466 F.3d at 882 ("If the evidence can support either affirming or reversing the ALJ's conclusion, we may not substitute our judgment for that of the ALJ.").  Thus, lack of supporting objective medical evidence was a specific, clear and convincing reason for discounting Plaintiff's statements concerning pain, symptoms, and level of limitation.

///

///

2. *Reason No. 2: Plaintiff's Course of Treatment*

In finding Plaintiff's statements were not entirely consistent with the evidence, the ALJ relied on the fact that, despite Plaintiff's complaints of low back pain, Plaintiff was not a candidate for surgery. (AR 17, citing AR 1122.) "Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility" for benefits. *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006). The ALJ relied on a December 2013 evaluation in which a qualified medical evaluator, Stephen P. Suzuki, M.D., opined that Plaintiff was not a surgical candidate and "overall follow-up would best be managed by a pain management physician." (AR 1122.) Plaintiff notes that the "report was prepared nearly five years before the ALJ's decision" and Plaintiff's condition had deteriorated. (JS 10.) Instead, Plaintiff points to a January 2018 treatment note in which spinal injections were recommended, with the *possibility* of surgery and Plaintiff "expressed that she is very much against surgery" (AR 769). (JS 11.) While Plaintiff suggests that the ALJ relied on outdated medical evidence, the December 2013 evaluation is from the relevant time period as Plaintiff alleged an onset date of February 12, 2012. (*See* AR 13.) Moreover, the ALJ relied on multiple instances in which Plaintiff's back pain was treated with conservative treatment, including physical therapy referrals, chiropractor referrals, stretches, exercise, non-narcotic medication, use of ice and heat, and a medium-firm mattress. (AR 17-20; *see* AR 370-71, 423, 615, 652, 883).

The ALJ also relied on the fact that Plaintiff rejected recommended treatments and was noncompliant. (*See* AR 17-20.) When assessing a claimant's credibility, an ALJ may consider an unexplained or inadequately explained failure to follow a prescribed course of treatment. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *Burch*, 400 F.3d at 68. As to Plaintiff's back pain complaints, the ALJ noted that Plaintiff rejected recommended treatments and was noncompliant with pain management. (AR 17, citing AR 736, 743, 824, 1102, 1106, 1122.) The ALJ relied

on reports that Plaintiff was not on pain medication and declined injections. (*Id.*, citing AR 601.)   Plaintiff contends that the ALJ must consider the reason an individual does not comply with recommended treatment and that the ALJ did not provide an explanation. (JS 10.)  However, later in the decision, the ALJ goes on to note that Plaintiff was treating her plantar fasciitis with cortisone injections, even though she had rejected injections for her back because she did not like the idea of shots. (AR 743.)  While fear of injections or of undergoing a certain procedure may be a reasonable explanation for declining treatment, Plaintiff's acceptance of cortisone injections casts doubt on Plaintiff's explanation that she does not like shots.

Plaintiff also stopped attending pain management "after her narcotics were discontinued due to irregularities on drug urine screens including the absence of prescribed medication and a positive result for heroin, though she denied these findings." (AR 19, AR 717, 723, 736.)  Plaintiff argues that the ALJ failed to explain how a toxicology report documenting the presence of heroin warrants discounting Plaintiff's claims and contends that the drug use is in question. (JS 9.)  However, Plaintiff ignores that the ALJ did not rely solely on the toxicology report, in which Plaintiff tested positive for heroin and her prescribed medications did not appear. (*See* AR 19.)  In December 2017, Plaintiff had still not agreed to a pain management plan. (AR 19, citing AR 788; *see* AR 787.)  The ALJ also relied on an April 20, 2018 treatment note in which the physician explained that she would not prescribe any pain medication and would need a baseline urine drug screen.  (AR 19, citing AR 743.) Plaintiff became upset and refused to provide a urine sample. (*Id.*)  Plaintiff's delay in submitting to a pain management plan, refusal to provide a urine sample, and the toxicology report showing the absence of Plaintiff's prescribed medication suggest that Plaintiff's symptoms were not as debilitating as she alleged.  *See Henderson v. Colvin*, No. 6:13-CV-01184-PK, 2015 WL 1549007, at *12 (D. Or. Apr. 7, 2015) (holding ALJ's credibility determination was proper where toxicology report was negative for the medication claimant was prescribed); *see also Gonzales v. Colvin*,

No. EDCV 12-00372-MAN, 2013 WL 2445210, at *5 (C.D. Cal. June 5, 2013) (finding ALJ properly discredited claimant where noncompliance was a result of being dropped from mental health and substance abuse programs due to missed meetings).

Similarly, as to the Plaintiff's complaints regarding her feet, the ALJ noted that Plaintiff was "fitted for orthotics," but failed to follow up and was discharged. (AR 20, citing AR 486, 524-25.)  The ALJ did note that Plaintiff underwent surgery, however, she was noncompliant with the postsurgical instructions. (AR 20, citing AR 841.)  The ALJ also reasonably relied on Plaintiff's failure to follow up on a referral for surgical evaluation of her carpal tunnel syndrome (AR 20, citing AR 690, 731). *See Austin v. Berryhill*, No. 1:16-CV-02035-JO, 2018 WL 1095555, at *4 (D. Or. Feb. 15, 2018) (finding ALJ properly drew an adverse inference from claimant declining treatments, including surgery, that would alleviate symptoms).

Accordingly, the Court finds that this was a clear and convincing reason, supported by substantial evidence, to discount Plaintiff's subjective symptom testimony. *See Orn*, 495 F.3d at 638.

3.      *Reason No. 3: Inconsistencies with Plaintiff's statements and day-to-day activities*

The ALJ found that "some of [Plaintiff's] statements and day-to-day activities [were] inconsistent with the extent of her allegations." (AR 22.)  First, the ALJ reasoned that while Plaintiff alleged disability beginning in 2012, she worked as a caretaker in 2015 until she moved. (AR 22, citing AR 493.)  Plaintiff contends that "it is unclear how [Plaintiff's] limited caretaking activity constitutes an inconsistency with her alleged level of activity." (JS 14.)  Plaintiff's caretaking consisted of two hours per day, six days per week. (*Id.*)   Based on this level of activity, it was reasonable for the ALJ to conclude that Plaintiff's work as a caretaker suggested her symptoms were not as severe as alleged. *See Hunt v. Colvin*, No. EDCV 12-1117 AN, 2013 WL 1969401, at *4 (C.D. Cal. May 13, 2013) (finding "ALJ properly

20

inferred that Plaintiff's continued work indicated she was not as physically limited as she purported to be"); *see also Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (holding an ALJ may consider inconsistent statements by a claimant in assessing his credibility).

Second, the ALJ found Plaintiff's day-to-day activities were inconsistent with the extent of her allegations. (AR 22.) Inconsistencies between symptom allegations and daily activities may act as a clear and convincing reason to discount a claimant's credibility. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008); *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991). But a claimant need not be utterly incapacitated to obtain benefits. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

The mere ability to perform some tasks is not necessarily indicative of an ability to perform work activities because "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." *Fair*, 885 F.2d at 603; *see also Molina*, 674 F.3d at 1112-13 (the ALJ may discredit a claimant who "participat[es] in everyday activities indicating capacities that are transferable to a work setting"). For example, a claimant's ability to watch television is not an activity that is easily transferable to the workplace. *See Orn*, 495 F.3d at 639 (finding that "reading, watching television, and coloring in coloring books are activities that are so undemanding that they cannot be said to bear a meaningful relationship to the activities of the workplace").

However, the ALJ may also rely on a claimant's "daily activities to form the basis of an adverse credibility determination" where the activities contradict the claimant's other testimony. *Orn*, 495 F.3d at 639; *see Burkett v. Berryhill*, 732 F. App'x 547, 552 (9th Cir. 2018) ("While transferability of skills to a work setting is one way in which an ALJ may consider a claimant's daily activities, an ALJ may also discount claimant testimony where reported daily activities contradict the claimant's alleged extent of her limitations.").

Here, the ALJ found several of Plaintiff's claims were inconsistent with Plaintiff's activities. (*See* AR 22.) The ALJ discounted Plaintiff's statements because the records showed Plaintiff engaged in activities that exceed the degree of limitation alleged. (*Id.*) Specifically, the ALJ reasoned that Plaintiff's reported limitations, including back pain, foot pain, and carpal tunnel syndrome, and statements that she spent all day in bed were inconsistent with Plaintiff's ability "to 'move all of her stuff' to her daughter's house." (AR 22 (quoting AR 648).) The ALJ also relied on Plaintiff's ability to do her own laundry, fold blankets, wash dishes, prepare simple meals, handle magazines, highlight passages, and fill crossword puzzles despite her alleged back pain, foot, pain and carpal tunnel syndrome. (AR 22, citing AR 51-52, 285-86, 493, 507.)

Similarly, the ALJ reasoned that Plaintiff's daily activities were inconsistent with her allegations of depression and anxiety as she "maintains intact cognition and remains socially connected with others." (AR 22.) Specifically, the ALJ relied on Plaintiff's ability to live with friends, family, and with a partner. (*Id.*, citing AR 507, 649,774.) Additionally, the ALJ noted that Plaintiff visits friends and others regularly, she attends church and court hearings, attends medical appointments, shops in stores, and does not need reminders or a companion. (AR 22, citing AR 287-88, 507, 594, 660, 740.) Plaintiff does not report having issues getting along with others and reported that she has never lost a job due to interpersonal issues. (AR 22, citing AR 289-90.) Plaintiff also has a driver's license, is able to drive alone, plays games, solves puzzles, reads, watches television and movies, and is able to pay bills, count change, and manage bank accounts. (AR 22, citing AR 288-90, 766.) The ALJ also noted that Plaintiff did "not need reminders to maintain her personal grooming, and is able to use calendar and pill container to manage her daily medications." (AR 22, citing AR 286.)

First, Plaintiff contends that the ALJ erred in relying on Plaintiff moving her possessions to her daughter's house, because there is no indication that Plaintiff

"moved heavy objects or furniture or needed a moving truck to get her 'stuff' around after a domestic dispute." (JS 14-15.) "An ALJ errs when he or she mischaracterizes a claimant's testimony by ignoring reports that daily activities are conducted with assistance, with great pain, or with limitation-related disruptions." *Furtado v. Colvin*, No. 13-CV-04063-HRL, 2017 WL 1365208, at *3 (N.D. Cal. Apr. 14, 2017) (citing *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014); *see also Duenas v. Berryhill*, No. ED CV 17-00193-DFM, 2018 WL 1470514, at *4 (C.D. Cal. Mar. 23, 2018) ("Evidence of a claimant's daily activities cannot be used to discredit a treating physician's opinion when the nature of those activities is unclear."). Plaintiff is correct that the record does not establish what "moving" to her daughter's house entailed. However, because the ALJ went on to rely on additional evidence in determining that Plaintiff's activities were inconsistent with her statements regarding her physical impairments, this error was harmless. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004) (finding that ALJ's error in assuming claimant was sitting while watching television was harmless where there was additional evidence supporting the ALJ's credibility determination.)

Second, Plaintiff contends that the ALJ "fail[ed]to explain how the cited to activities are inconsistent with [Plaintiff's]statements concerning her impairment and with a disability." (JS 15.) However, as discussed above, the ALJ properly cited numerous examples identifying inconsistencies between Plaintiff's testimony and the activities she engaged in. *See Burkett*, 732 F. App'x at 552 (finding ALJ did not err in relying on claimant's activities where "ALJ cited examples in the record illustrating inconsistencies between [claimant's] testimony concerning the limiting effects of her symptoms and her activities").

Accordingly, this was a specific, clear and convincing reason for discounting Plaintiff's subjective symptom testimony. *See Cleveland v. Astrue*, No. CV 09-4852SS, 2010 WL 1678294, at *11 (C.D. Cal. Apr. 23, 2010) ("ALJ properly found ///

that the degree of daily activities in combination with [claimant's] work after his alleged onset date . . . cast doubt on Plaintiff's assertion that he is totally disabled).

### E. Conclusion

In sum, the Court finds that the ALJ gave specific, clear and convincing reasons for discounting Plaintiff's subjective symptom testimony.

## V. **CONCLUSION**

IT IS ORDERED that Judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits.

IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: July 22, 2020

_____

ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

### NOTICE

**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN WESTLAW, LEXIS/NEXIS, OR ANY OTHER LEGAL DATABASE.**